295 F.Supp.2d 30 (2003)
In re LORAZEPAM & CLORAZEPATE ANTITRUST LITIGATION
Health Care Service Corporation, et al., Plaintiffs,
v.
Mylan Laboratories, Inc., et al., Defendants.
Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of Massachusetts, and Federated Mutual Insurance Company, Plaintiffs,
v.
Mylan Laboratories, Inc. et al., Defendants.
No. MDL 1290(TFH), MISC.NO. 99MS276(TFH), CIV.01-2646(TFH), CIV.02-1299(TFH).
United States District Court, District of Columbia.
October 17, 2003.
*31 *32 George H. Crompton, DKW Law Group, PC, Pittsburgh, PA, Joseph Anthony Hynds, Rothwell, Figg, Ernst & Manbeck, Washington, DC, Ryan James, DKW Law Group, PC, Pittsburgh, PA, Brian S. Roman, DKW Law Group, PC, Pittsburgh, PA, Peter M. Todaro, King & Spalding, Washington, DC, for Mylan Laboratories, Inc., Mylan Pharmaceuticals, Inc., Defendants.
Lisa R. Fine, Weil, Gotshal & Manges, L.L.P., Washington, for Gyma Laboratories of America, Inc., Defendant.
David T. Fischer, Porter, Wright, Morris & Arthur, Washington, DC, Robert T. Rhoad, Porter Wright Morris & Arthur, Washington, DC, for Health Care Service Corporation, Plaintiff.
Eric Sean Jackson, Robins, Kaplan, Miller & Ciresi, L.L.P., Washington, DC, for Blue Cross Blue Shield of Minnesota, Plaintiff.
Thomas Joseph Poulin, Robins, Kaplan, Miller & Ciresi, L.L.P., Washington, DC, for Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Minnesota, Federated Mutual Insurance Company, Plaintiffs.
*33 Jonathan R. Tuttle, Debevoise & Plimpton (N.Y.), New York, NY, for Cambrex Corporation, Defendant.

MEMORANDUM OPINION
THOMAS F. HOGAN, Chief Judge.
Pending before the Court is Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaints Pursuant to Federal Rule of Civil Procedure 12(b)(6) [Civ. No. 01-2646 docket # 26] ("Def. Mot."). Upon careful review of Defendants' motion, Plaintiffs' oppositions,[1] Defendants' reply thereto, the various supplemental filings of both parties, and the entire record herein, the Court will deny the motion.

I. BACKGROUND[2]
The background and procedural history in this case is quite extensive and has been presented in several other opinions. See, e.g., the following In re Lorazepam and Clorazepate Antitrust Litigation opinions: 289 F.3d 98 (D.C.Cir.2002); 202 F.R.D. 12 (D.D.C.2001); TFH Mem. Op. of 08/20/02 (filed 08/21/02).
As pertaining specifically to the motion at hand, the Plaintiffs instituted this action alleging that Defendants entered into exclusive licensing agreements in restraint of trade in order to raise, maintain, and stabilize the prices for the generic drugs lorazepam and clorazepate, and that Defendants monopolized or attempted to monopolize the markets for lorazepam and clorazepate tablets and the active pharmaceutical ingredients ("API") used to manufacture these drugs. See, e.g., Complaint* ¶¶ 4, 8, 20; Complaint ¶¶ 4, 9, 19. Plaintiffs have filed suit under Minnesota, Massachusetts, and Illinois state law on behalf of themselves as third party payors for prescription drugs for their insureds, and on behalf of certain unnamed nonparty customers, including employer-sponsored health plans, seeking to recover "the millions of dollars in overpayments for Lorazepam and Clorazepate" allegedly paid by Plaintiffs and the nonparties. Complaint* ¶ 1; Complaint ¶ 1. Plaintiffs state that they have the authority on behalf of their self-funded customers to pursue claims against the Defendants. Complaint* ¶¶ 13-15; Complaint ¶ 14. Plaintiffs allege that they paid for and absorbed supracompetitive prices allegedly charged by Mylan by making reimbursements for Lorazepam and Clorazepate tablets pursuant to insurance contracts with employee benefit plans that provide prescription drug coverage to their members. Complaint* ¶¶ 7, 39; Complaint ¶¶ 9, 21.

II. LEGAL STANDARD FOR MOTIONS TO DISMISS
A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) will be granted only if *34 "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); see Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) ("A court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations."). In reviewing such a motion, the Court must construe the complaint in the light most favorable to plaintiff and must accept as true all allegations and all reasonable factual inferences drawn from well-pleaded factual allegations. See Square D. Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 411, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); In re United Mine Workers of America Employee Benefit Plans Litig., 854 F.Supp. 914, 915 (D.D.C.1994). "However, the court need not accept inferences drawn by Plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C.Cir.1994) (citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

III. DISCUSSION

A. Plaintiffs BCBS Minnesota, Federated, and HCSC Do Not Lack Antitrust Standing

1. Overall

BCBS Minnesota and Federated have filed claims against Defendants under Minnesota antitrust laws, and HCSC has filed claims under Illinois antitrust laws. Defendants claim that all three of these Plaintiffs lack antitrust standing to pursue these claims because: (1) they are not participants in any market in which Defendants allegedly restrained and monopolized trade, and (2) Plaintiffs will be unable to establish that Defendants' anticompetitive conduct proximately caused Plaintiffs' claimed harm. Mot. at 4-5.[3]

2. Pertinent State Law; Such Law To Be Interpreted Via Federal Antitrust Decisions

The Supreme Court held in California v. ARC Am. Corp., 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989) that states could allow indirect purchasers suing for overcharges to recover under their own antitrust laws. Id. at 102, 109 S.Ct. 1661.

a. Plaintiffs BCBS Minnesota and FederatedMinnesota Law
Third party payor health service organizations have the right to sue under the Minnesota Antitrust Law for antitrust violations. See State by Humphrey v. Philip Morris Inc., 551 N.W.2d 490, 495 (Minn.1996) (discussed further infra). Crucially, Plaintiffs BCBS Minnesota and Federated allege a direct injury aimed at their managed care programs to reduce generic drug prices, that they were forced to absorb the increased costs of Lorazepam and Clorazepate, and that these costs were not passed on to their members. Complaint* ¶¶ 36-48, 95-96.
The Minnesota Antitrust Law confers standing on indirect purchasers like BCBS Minnesota and Federated by its express text:
Any person, any governmental body, or the state of Minnesota or any of its subdivisions or agencies, injured directly *35 or indirectly by a violation of sections 325D.49 to 325D.66, shall recover three times the actual damages sustained, together with costs and disbursements, including reasonable attorneys' fees. In any subsequent action arising from the same conduct, the court may take any steps necessary to avoid duplicative recovery against a Defendant.
Minn.Stat. § 325D.57.
Even absent such statutory authority, the Minnesota Supreme Court noted in Humphrey that BCBS Minnesota would likely have standing on its antitrust claim based upon the reasoning articulated in Blue Cross & Blue Shield United of Wisconsin v. Marshfield Clinic, 65 F.3d 1406 (7th Cir.1995) (cert. denied, 516 U.S. 1184, 116 S.Ct. 1288, 134 L.Ed.2d 233). See Humphrey, 551 N.W.2d at 495-96. In Marshfield Clinic, the Seventh Circuit ruled that Blue Cross had standing to sue defendant Marshfield Clinic that was separate from the standing of its insureds to sue. That court noted that "the money went directly from Blue Cross to the Clinic, and although the two entities were not linked by any overarching contract, each payment and acceptance was a separate and completed contract. We do not think more is required to establish Blue Cross's right to sue to collect these overcharges." Id. at 1414. The Seventh Circuit found that "Blue Cross paid Marshfield Clinic directly in accordance with Blue Cross's contractual obligations to its insureds, and if it paid too much because the Clinic violated antitrust laws then it ought to be allowed to sue to recover these damages." Id. Indeed, "[i]t would be cumbersome, to say the least, for patients of the Marshfield Clinic to organize into a class action to recover money that the patients never paid and that if they received in a judgment or settlement they would have to share with Blue Cross ...." Id. In sum, the Minnesota Supreme Court has concluded that third party payor health services organization possess the general right to sue in antitrust under Section 325D.57 of the Minnesota Antitrust Law. Humphrey, 551 N.W.2d at 495-96.
The issue was raised that Marshfield Clinic does not provide standing to third party payors such as the BCBS Plaintiffs who neither made direct payments to any of the Defendants nor had any direct dealings with the Defendants.[4] In Int'l Bhd., of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc., 196 F.3d 818, 826 (7th Cir.1999) ("Teamsters") [a tobacco litigation case], the court noted that "Marshfield Clinic does not countenance recovery by insurers whose balance sheets are affected by substances that made their insureds ill." However, in Marshfield Clinic, as in the case at hand, "[m]any of the overpriced services [or drugs] were paid directly by the Blues ...." Id. Further, in Desiano v. Warner-Lambert Co., 326 F.3d 339, 349 (2d Cir. 2003) (discussed more fully infra at pp. 38-39), as is also similar to the case at hand, the plaintiffs alleged an injury directly to themselves as a result of the defendants' overcharges. Such damages "were in no way `derivative of damage to a third party.'" Id. When the well-pled Complaints are read in light of the Desiano rationale, it is clear that Plaintiffs have properly alleged they were charged, and in turn paid for, the supracompetitive prices fixed by Defendants' alleged conspiracy for lorazepam and clorazepate. Under such circumstances, it is not crucial for Plaintiffs to have directly paid Defendants; *36 what is important instead is that these Plaintiffs have alleged that they were directly harmed by Defendants' conduct.

b. Plaintiff HCSCIllinois Law
The text of the Illinois Antitrust Act provides in pertinent part that "[a]ny person who has been injured in his business or property, or is threatened with such injury, by a violation of [the Act] may maintain an action ... for damages, or for an injunction, or both, against any person who has committed such violation." 740 Ill. Comp. Stat. § 10/7(2). In defining who may bring a claim under the Act, Section 10/7(2) goes on to provide that:

no provision of this Act shall deny any person who is an indirect purchaser the right to sue for damages. Provided, however, that in any claims that are asserted against a defendant by both direct and indirect purchasers, the court shall take all steps necessary to avoid duplicative liability for the same injury including transfer and consolidation of all actions.
Id. (emphasis added).
The issue was raised as to whether decisions construing the standing requirements of the Clayton Act no longer serve as a meaningful guide to interpreting section 10/7 of the Illinois Antitrust Act. See HCSC Opp'n at 10. This argument proceeds as follows: Section 10/11 of the Illinois Antitrust Act provides that "[w]hen the wording of this Act is identical or similar to that of the federal antitrust law, the courts of this State shall use the construction of the federal law by the federal courts as a guide." 740 Ill. Comp. Stat. § 10/11. Standing under the Illinois Antitrust Act is governed by Section 10/7, which, since the 1981 amendments, repealed Illinois Brick; therefore, since section 10/7 is no longer identical or similar to section 4 of the Clayton Act, federal decisions interpreting the Clayton Act no longer apply, and courts should instead apply Illinois law.
However, the Seventh Circuit does not share this view of Illinois law. Irrespective of any differences that might exist between the wording of the Illinois Antitrust Act and that of the federal antitrust laws, "[f]ederal antitrust standing rules apply under the Illinois Antitrust Act." O'Regan v. Arbitration Forums, Inc., 121 F.3d 1060, 1066 (7th Cir.1997). In a different case, the Seventh Circuit expanded on this theme:
Illinois does not follow the Illinois Brick doctrine. 740 ILCS 10/7(2). But in other respects Illinois antitrust law uses the federal approach, see O'Regan v. Arbitration Forums, Inc., 121 F.3d 1060, 1066 (7th Cir.1997) (holding that Illinois would apply the federal remoteness approach to a claim under state antitrust laws), and, as we have observed, the Illinois Brick doctrine is only one of several obstacles to insurers' recovery on an antitrust claim. The direct-purchaser doctrine of Illinois Brick and the direct-injury doctrine of Associated General Contractors are analytically distinct. Blue Shield of Virginia v. McCready, 457 U.S. 465, 476, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) ....
Teamsters, 196 F.3d at 828. Accordingly, this Court will construe the Illinois Antitrust Act in harmony with federal antitrust decisions.

c. Pertinent State Law To Be Interpreted Consistently With Federal Law
Health services organizations attempting to recoup increased health care costs arising from alleged anticompetitive conduct must establish specific antitrust injury and proximate causation. Group *37 Health Plan, Inc. v. Philip Morris Inc., 68 F.Supp.2d 1064, 1068-69 (D.Minn.1999); Tremco, Inc. v. Holman, No. C8-96-2139, 1997 WL 423575 (Minn.App. July 29, 1997) (unpublished opinion). Antitrust standing is generally limited to consumers and competitors of alleged antitrust malefactors. Tremco at *2 (citing Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 538, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("AGC")).
The Tremco rationale is consistent with federal courts' approach to the question of antitrust standing, and the Minnesota Antitrust Law is to interpreted consistently with federal decisions construing the federal antitrust statutes. See, e.g., Minnesota Twins P'ship v. State ex rel. Hatch, 592 N.W.2d 847, 851 (Minn.1999); Lamminen v. City of Cloquet, 987 F.Supp. 723, 734 (D.Minn.1997). Similarly, as noted above, the Illinois Antitrust Act is to be construed in harmony with federal antitrust decisions. Teamsters, 196 F.3d at 828.

3. Application and Analysis of Federal (i.e., AGC) Factors to The Instant Case

"It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action ...." AGC, 459 U.S. at 535, 103 S.Ct. 897 (quoting McCready, 457 U.S. at 477, 102 S.Ct. 2540). Therefore, the Supreme Court has provided guidance as to how courts and parties should determine whether proximate causation and antitrust standing exists in a particular case:
[T]he question whether the [plaintiff] may recover for the injury it allegedly suffered by reason of the defendants' coercion against certain third parties cannot be answered simply by reference to the broad language of § 4 [of the Clayton Act]. Instead, ... the question requires us to evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them. [FN31]
FN31. The label "antitrust standing" has traditionally been applied to some of the elements of this inquiry.... [T]he focus of the doctrine of "antitrust standing" is somewhat different from that of standing as a constitutional doctrine. Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.
AGC, 459 U.S. at 535, 535 n. 31, 103 S.Ct. 897.
The Supreme Court has set forth five (5) factors a court should consider in determining whether a plaintiff possesses antitrust standing and is, therefore a proper party to bring suit:
1. The nature of plaintiff's claimed injury;
2. The directness of the injury;
3. The specific intent of the alleged Defendants;
4. The character of the alleged damages, including the risk of duplicative recovery, the complexity of apportionment and their speculative nature; and
5. The existence of other, more appropriate Plaintiffs.
AGC, 459 U.S. at 537-45, 103 S.Ct. 897.
As set forth below, this Court has applied the five AGC factors to the case at hand and has found that BCBS Minnesota, Federated, and HCSC are proper parties and therefore have standing to pursue their claims.

*38 AGC Factor Nos. 1 and 2: The nature of plaintiff's claimed injury, and the directness of Plaintiffs' alleged injuries.[5]
A direct relationship between the claimed injury and the alleged anticompetitive conduct is a central element to the proximate cause determination. Indeed, "a plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the Defendant's acts [i]s generally said to stand at too remote a distance to recover." Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 268-69, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Various Courts of Appeals that have addressed third party payor actions in the tobacco litigation context have held that antitrust Plaintiffs who are seeking to recover reimbursement for the payment of increased health care costs for insureds caught by alleged anticompetitive conduct lack antitrust standing because their alleged damages are derivative of injuries to their subscribers and, therefore, too remote to permit recovery. See, e.g., Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc., 249 F.3d 1068, 1071 n. 2, (D.C.Cir.2001) (citing cases from 2d, 3d, 5th, 7th, and 9th Circuits). In Service Employees, the D.C. Circuit recognized that damages for such third party payor claims are highly speculative and difficult to calculate, pose the clear risk of duplicative recovery as other indirectly injured parties may also sue, and present the problem of complex apportionment of damages between different groups of direct and indirect Plaintiffs removed at various levels from Defendants' alleged wrongdoing. See id. at 1073-75. The D.C. Circuit noted that the Service Employees Plaintiffs had not suffered financial harm as they would simply collect higher premiums from the insureds to cover the increased costs. Id. at 1074 (citing Teamsters, 196 F.3d at 823-24, 826). The court opined that "the insurers ha[d] likely already passed the costs on to the directly injured through higher premiums." Id. at 1075.
It is also true that "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal., 190 F.3d 1051, 1057 (9th Cir.1999); see also Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc., 83 F.Supp.2d 70, 90-91 (D.D.C.1999) (overruled on other grounds by Serv. Employees Int'l Union Health & Welfare Fund v. Philip Morris, Inc., 249 F.3d 1068 (D.C.Cir.2001)); Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 922-32 (3d Cir.1999). However, "the Supreme Court has carved a narrow exception to the market participant requirement for parties whose injuries are `inextricably intertwined' with the injuries of market participants." Am. Ad. Mgmt., 190 F.3d at 1057 n. 5 (citing, inter alia, Blue Shield v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) [discussed infra]). Indeed, as is seen below, such is the claim of the instant Plaintiffs.
It is important to point out the differences in the case at hand from court decisions dismissing third party payor actions in the tobacco litigation context. For example, in Laborers Local 17 Health and Benefit Fund v. Philip Morris, 191 F.3d 229, 244 (2d Cir.1999), the court held that *39 the plaintiffs' alleged damages were purely derivative of the physical injuries suffered by plan participants and therefore too remote for the plaintiffs to have standing to sue the defendants. However, the Second Circuit distinguished the Laborers Local 17 holding in Desiano v. Warner-Lambert Co., 326 F.3d 339 (2nd Cir.2003). In Desiano,
the tobacco companies' alleged tort directly harmed only the smokers, who suffered both a health injury (smoking-related illness) and an economic injury (the purchase price of the fraudulently marketed cigarettes). The smoker's health injuries, in turn, caused economic losses to the insurance companies, who had to reimburse patients for the cost of their smoking related illnesses. That case was clearly one in which the Plaintiffs' damages were entirely derivative of the injuries to the insured....
In the instant case, instead, Plaintiffs allege an injury directly to themselves .... Thus the damages  excess money Plaintiffs paid Defendants for the [diabetes treatment drug] Rezulin that they claim they would not have purchased "but for" Defendants' fraudwere in no way "derivative of damage to a third party."
Desiano, 326 F.3d at 349. The allegations in Desiano are similar to the instant case, for "the [plaintiff] insurance companies [are] able to claimprecisely as they do herethat the Defendants engaged in a scheme to defraud it, and that the company suffered direct economic losses as a result." Id. at 350. Under the facts alleged in the Complaints, this Court concurs with and adopts the Desiano rationale, which may be summarized as follows:
Although this court has not to date held that insurance companies are, in all instances, the "purchasers" of the drugs for which they reimburse pharmacies, we, like several other courts, have indicated that in a variety of contexts they are the buyers. See, e.g., Med. Arts Pharmacy of Stamford, Inc. v. Blue Cross & Blue Shield of Conn., Inc., 675 F.2d 502, 505 (2d Cir.1982) ("[T]he Pharmacy Agreements ... are merely arrangements for the purchase of goods and services by Blue Shield.") (quoting Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 214, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979)); Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic, 65 F.3d 1406, 1414 (7th Cir.1995) (holding that insurance companies had standing, as the "direct purchaser[s]," to maintain an antitrust suit). Moreover, and more directly relevant to this case, perhaps, Plaintiffs point out that this and other courts have long recognized the right of HBPs to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices. See, e.g., Hartford Hosp. v. Chas. Pfizer & Co., 52 F.R.D. 131, 133 (S.D.N.Y.1971) (approving $10 million class action settlement of antitrust claims brought by insurance plans against drug companies).
Id. at 350-51.
Desiano did not hold that a plaintiff must show the existence of a written contract or agreement with a defendants; rather, what is important is not whether Plaintiffs have entered into a written purchase agreement with Defendants, but whether Plaintiffs were buyers from and "customers" of Defendants. The Complaints of the health insurance Plaintiffs in the case at hand specifically state that they paid and/or co-paid for Lorazepam and Clorazepate tablets dispensed pursuant to physicians' prescriptions. Complaint* ¶¶ 13-15, 36-48; Complaint ¶¶ 14; 20-22. One of the unique characteristics of the prescription drug market as opposed to, *40 say, the overall medical care insurance market, is that an insured (i.e., the patient) is not primarily responsible for the cost of the drug he or she is prescribed in the majority of cases (i.e., where the patient is covered by a drug benefit provided through insurers such as Plaintiffs). Although the physician prescribes, the pharmacist dispenses, and the patient takes the medication, in most cases, it is the insurer such as Plaintiffs who actually pay. This is clearly set forth in Plaintiffs' Complaints. Complaint* ¶¶ 36-48; Complaint ¶¶ 20-32. Accordingly, this Court finds that the Plaintiffs are indeed customers of the Defendants, and as such are the entities chiefly harmed by Defendants' alleged anticompetitive conduct. See In re Cardizem CD Antitrust Litig., 105 F.Supp.2d 618, 651 (E.D.Mich.2000) (discussed more fully infra; determining plaintiff health insurers are "customers" of defendant pharmaceutical companies and the injury claimed consists of higher prices paid for drugs as a result of the contractually mandated absence of competition between the defendants).
Another pertinent case is worthy of mention. See In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231 (D.Del.2002). This opinion dealt with plaintiffs' motion to approve a proposed settlement in a case alleging anticompetitive behavior in the Coumadin brand name prescription blood thinner market. Id. at 236. The issue of standing came before the Warfarin court after one objector asserted that the third party payors ("TPP") lack standing to assert any claims under the pertinent antitrust laws. Id. at 259. The court noted that "[w]hile TPP standing was never formally before challenged in the case at bar, the Third Circuit has already held that the consumer class members in this case have antitrust standing for injunctive relief." Id. (citing In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 402 (3d Cir. 2000)). Importantly, the court stated that
[t]he TPPs are arguably in the same position as consumers in that they allegedly paid supracompetitive prices for Coumadin or unnecessarily paid for Coumadin instead of lower-priced generic warfarin sodium. The TPPs here, as much as the consumers, could be considered "the target of DuPont's antitrust violation," in that they were the end parties absorbing the overcharges for the drugs. In re Warfarin, 214 F.3d at 401. In contrast, the Steamfitters [171 F.3d 912 (3d Cir.1999)] TPPs only suffered injury (paying for treatment of smoking-related illnesses) after physical injuries were suffered by their insureds and, thus, the TPPs' harm was derivative of the consumers' harm. Even if the TPPs do not have standing to assert direct claims, they would have subrogation claims against consumer class members ....
Id. The Warfarin court went on to note that
Objector also cites In re Rezulin Products Liability Litigation, 171 F.Supp.2d 299 (S.D.N.Y.2001), for the proposition that TPPs cannot collect damages for payments made on behalf of insureds. The case at bar can be distinguished from Rezulin, however, in that plaintiffs here allege economic injury due only to price overcharges, whereas the crux of the Rezulin claims was the marketing of a defective pharmaceutical product that caused physical injury or threat of physical injury to consumers.
Id. at 259 n. 26 (emphasis added). As described at length throughout this Court's opinion, Plaintiffs in the case at hand are alleging an injury similar to that claimed by the Warfarin plaintiffseconomic injury due only to price overcharges on the part of Defendants.
*41 In another relevant case, manufacturers of the drug Cardizem CD moved to dismiss against the plaintiffs, including indirect purchasers in Minnesota, arguing that the plaintiffs had failed to sufficiently allege antitrust injury. In re Cardizem CD Antitrust Litig., 105 F.Supp.2d 618 (E.D.Mich.2000). That court rejected the drug manufacturers' arguments, holding that indirect purchasers had sufficiently alleged an antitrust injury:
Plaintiffs are customers, not competitors of Defendants, and the injury claimed consists of higher prices paid for drugs as a result of the contractually mandated absence of competition between HMRI and Andrx. As to the second, or causal connection prong of the antitrust injury test, Plaintiffs have alleged that the HMRI/Andrx Agreement decreased generic competition, and that the decreased competition bargained for in the HMRI/Andrx Agreement caused their injuries. Thus, Plaintiffs' injuries coincide precisely with the rationale for finding a violation of the antitrust laws in the first place.
Id. at 651. Claiming a nearly identical context, Plaintiffs in the case at hand accurately state that since they were forced to absorb the costs of the increase for the prescriptions, it follows that there is a causal connection between Defendants' conduct and Plaintiffs' harm. BCBS Opp'n at 19 (citing Complaint* ¶¶ 96, 109); HCSC Opp'n at 14 (citing Complaint ¶¶ 14, 20-22; see also Complaint ¶ 56). Having reviewed the claims as set forth in the well-pled complaints of both Plaintiffs, this Court finds that Plaintiffs' injuries "coincide precisely with the rationale for finding a violation of the antitrust laws in the first place." In re Cardizem, 105 F.Supp.2d at 651.
In sum, this Court has applied the first two AGC factors, the nature of plaintiff's claimed injury and the directness of Plaintiffs' alleged injuries, and has found them to weigh in favor of the Plaintiffs in this action.

AGC Factor No. 3: Specific intent.
A showing of specific intent on Defendants' behalf to harm Plaintiffs by allegedly imposing increased health care costs is alone insufficient to overcome the bar on remote third party payor claims and will not alter a finding of no antitrust standing based upon lack of prima facie proximate causation. AGC, 459 U.S. at 537 & 537 n. 37, 103 S.Ct. 897 (specific intent to harm "is not a panacea that will enable any complaint to withstand a motion to dismiss."). Specific intent is to be considered merely as one of the five AGC factors.
Plaintiffs have alleged that Defendants possessed specific intent to harm. For example, Plaintiffs' Complaints set forth how Plaintiffs' Maximum Allowable Cost ("MAC") programs, which were designed to make sure that Plaintiffs' members receive the most competitive prices for generic drugs, were a specific threat to Mylan's desire to charge monopolistic prices for its products. Complaint* ¶¶ 42, 48; Complaint ¶¶ 22, 84, 96. By eliminating competitors through its agreements with other Defendants, Mylan knew it would eliminate MAC pricing and could charge sharply increased prices for Lorazepam and Clorazepate. Complaint* ¶¶ 48, 97; Complaint ¶¶ 57-58, 84, 96, 105, 121. As noted above, in reviewing a motion to dismiss, the Court must construe the complaint in the light most favorable to plaintiff and must accept as true all allegations and all reasonable factual inferences drawn from well-pleaded factual allegations. See Square D. Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 411, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); In re United Mine Workers of America Employee Benefit Plans Litig., 854 *42 F.Supp. 914, 915 (D.D.C.1994). Because BCBS, Federated, and HCSC have adequately pled specific intent in their complaint, this element is satisfied.
AGC Factor No. 4: Character of alleged damages, including the risk of duplicative recovery, the complexity of apportionment and their speculative nature.
Plaintiffs clearly allege that they suffered an antitrust injury that the Minnesota statute was designed to address. There is no dispute that the earlier actions in this case initiated by the Federal Trade Commission, the direct purchasers class, and other indirect purchasers were all a result of the same alleged conduct by Defendants that the current Plaintiffs allege. When the well-pled Complaints are read in light of that history, this Court concludes that these indirect purchasers have sufficiently alleged that they suffered an antitrust injury because the higher prices they were forced to pay "were the raison d'etre of [Defendant's] antitrust conduct." In re Warfarin, 214 F.3d at 402; see also In re Ciprofloxacin Hydrochloride Antitrust Litig., 261 F.Supp.2d 188, 211-12 (E.D.N.Y. 2003) (same). The Warfarin court applied the rationale of Blue Shield v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), in which the Supreme Court noted the existence of a narrow exception to the market participant requirement for parties whose injuries are "inextricably intertwined" with the injuries of market participants. The Third Circuit stated:

McCready determined that an antitrust injury occurred because the higher cost for services paid by McCready was so "inextricably intertwined" with the true target of the conspiracy, the psychologists, that McCready also suffered antitrust injury. Utilizing this same rationale, we find that Coumadin consumers clearly suffer antitrust injury. Coumadin purchasers were the target of [defendant] DuPont's antitrust violation. Regardless of the existence of the various links of middlemen, if there were no ultimate consumer of Coumadin, prices charged for the drug by DuPont to distributors, pharmacies, etc., would be irrelevant. The excess amount paid by Coumadin users not only is "inextricably intertwined" with the injury DuPont aimed to inflict, the overcharge was the aim of DuPont's preclusive conduct. It is difficult to imagine a more formidable demonstration of antitrust injury.

In re Warfarin, 214 F.3d at 401 (emphasis added).
Other courts have come to similar conclusions. For example, the Seventh Circuit specifically held that where, as here, Plaintiffs seek overcharges paid for products provided to their insureds, they are proper parties to assert an antitrust claim and have an independent right to seek to collect overcharges. Marshfield Clinic, 65 F.3d at 1414. Thus, Plaintiffs have standing to assert the claims alleged in the Complaints. See also In re Cardizem, 105 F.Supp.2d at 650 (third party payors are "customers" of drug manufacturer).
As with the first two AGC factors, it is crucial to point the difference between the instant case and cases related to suits brought against tobacco companies to recover costs incurred in treating smoking-related illnesses. The distinction is that the "tobacco plaintiffs" did not demonstrate that they were directly harmed by the defendant tobacco companies' alleged unlawful conduct; rather, they asserted claims which were derivative of the harm suffered by smokers. See, e.g., Oregon Laborers Employers Health & Welfare Trust Fund v. Philip Morris, Inc., 185 F.3d 957, 967 (9th Cir.1999); Hawaii Health & Welfare Trust Fund v. Philip Morris, Inc., 52 F.Supp.2d 1196, 1199 *43 (D.Haw.1999); Serv. Employees, 249 F.3d at 1072-73. Here, however, Plaintiffs have alleged that they were directly harmed as a result of the payments that they made and were forced to absorb. As specifically averred in the Complaints, BCBS Minnesota, Federated, and HCSC are able to calculate the harm caused as a result of Mylan's price increases. Complaint* ¶ 96, 109-111; Complaint ¶¶ 56, 72-74. Moreover, "[b]ecause their members' "copayments were the same without regard to the drugs' cost following Mylan's price increase" (e.g., $5 copayment for generic without regard to the price of the generic), Plaintiffs and not their members were forced to eat these price hikes." Complaint* ¶ 96; see also Complaint ¶ 56. The Court finds this as further evidence that Plaintiffs have clearly claimed an injury which possesses a sufficient direct causal relationship to the Defendants' alleged wrongdoing.
In a similar case in which indirect purchasing consumers sought to recover overcharges resulting from inflated drug prices directly flowing from the defendant's anti-competitive activity, the United States District Court in Delaware ruled that non-party third party payors were the proper parties to a suit:
If defendant's monopolization of the oral anticoagulant market resulted in supra-competitive prices for Coumadin, the insurance companies and third party payor organizations most likely absorbed some or all of that overcharge. Those organizations, and not more remote victims like class plaintiffs, are the proper parties to bring suit to recover the overcharge.
In re Warfarin Sodium Antitrust Litig., No. MDL 98-1232-SLR, 1998 WL 883469, at *19 (D.Del. Dec.7, 1998) (rev'd on other grounds, 214 F.3d 395 (3d Cir.2000)).
Finally, any risk of double recovery is eliminated because of Plaintiffs' ability to quantify their specific damages, which have not been passed through to their members. BCBS Opp'n at 26; HCSC Opp'n at 14-15; see also Complaint* ¶¶ 36-37; Complaint ¶¶ 20-22.
AGC Factor No. 5: Existence of Other, More Appropriate Plaintiffs.
After reading both complaints in light of the Court's discussion of the first four AGC factors, and because of the unique harm that each of the Plaintiffs has allegedly suffered, there is no other, more appropriate plaintiff who could recover the money that BCBS Minnesota, Federated, and HCSC paid as overpayments. Under the analysis presented above, the Court finds at this time that Plaintiffs have standing to proceed in this suit. As additional evidence is presented to the Court at or before trial, the Court may revisit this issue as warranted. However, "on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court is obliged to accept as true Plaintiffs' assertion that they were, in fact, the purchasers of the drug." Desiano, 326 F.3d at 350-51; see also Square D., 476 U.S. at 411, 106 S.Ct. 1922; In re United Mine Workers, 854 F.Supp. at 915.

B. Plaintiff BCBS Massachusetts Has Stated a Claim Upon Which Relief May Be Granted Under the Massachusetts Consumer Protection Act
In Counts I, III, V, VII, IX, XI, XIII, and XV of its Complaint, Plaintiff BCBS of Massachusetts seeks to recover for Defendants' alleged anticompetitive conduct under the provisions of the Massachusetts Consumer Protection Act ("Consumer Protection Act" and "ch. 93A") which prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce ...." Mass. Gen. Laws ch. 93A, *44 § 2(a). As a "non-profit hospital and medical services corporation," BCBS Massachusetts has brought an action under both Section 9 and Section 11 of the Consumer Protection Act. Complaint* ¶¶ 115, 143, 171, 201, 231, 257, 285, 311. Specifically, BCBS Massachusetts has pled that it
is a person under chapter 93 and is entitled to pursue an action under Section 11 of the Consumer Protection Act as an entity that engages in the conduct of trade or commerce in the Commonwealth of Massachusetts. Alternatively, BCBS Massachusetts is entitled to pursue an action under Section 9 as a non-profit entity that does not engage in the conduct of trade or commerce. Mass. Gen. Laws ch. 93A, § 9, § 11.
Complaint* ¶ 115. A "person" under ch. 93A includes natural persons, corporations, and any other legal entity. Mass. Gen. Laws ch. 93A, § 1(a).[6] Section 11 of the Consumer Protection Act states that any person "who engages in the conduct of any trade or commerce" and who suffers injury as a result of unfair or deceptive acts of another person engaged in trade or commerce, may bring an action for damages. Id. § 11. Section 9 provides a similar right to bring an action for damages based upon unfair or deceptive conduct, but only for persons who are not entitled to bring an action under section 11. Id. § 9.
By their terms, however, [these] two sections of chapter 93A ... are mutually exclusive: section 11 entitles "[a]ny person who engages in the conduct of any trade or commerce" to bring an action for unfair or deceptive practices, whereas section 9 grants essentially the same entitlement to aggrieved consumers. Withal, section 11 affords no relief to consumers and, conversely, section 9 affords no relief to persons engaged in trade or commerce.
Continental Ins. Co. v. Bahnan, 216 F.3d 150, 156 (1st Cir.2000) (internal citations omitted). Accordingly, a ch. 93 Plaintiff must proceed under either Section 9 or Section 11, but not both. John Beaudette, Inc. v. Sentry Ins. A Mut. Co., 94 F.Supp.2d 77, 120-24 (D.Mass.1999) (emphasis added).
The Massachusetts Supreme Court has recently concluded that "indirect purchasers can assert claims for price-fixing or other anticompetitive conduct under [Mass. Gen. Laws ch.] 93A § 9, where they have no standing [otherwise] to bring such claims under [Mass. Gen. Laws ch.] 93A §§ 1-14A." Ciardi v. F. Hoffmann-La Roche, Ltd., 436 Mass. 53, 762 N.E.2d 303, 306 (2002). Ciardi expressly allows indirect purchaser actions by "[a]ny person, [other than a businessperson entitled to bring an action under § 11] ...." As Section 11 affords a remedy to, inter alia, any natural person, corporation, or other legal entity "who engages in the conduct of any trade or commerce," and such remedy would thereby preclude the pursuit of a claim under Section 9, this Court must therefore make a threshold determination whether BCBS Massachusetts is or is not engaged in trade or commerce.[7]
Chapter 93A defines "trade" and "commerce" as including
the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security as defined in subparagraph (k) of section four hundred and one of chapter one hundred *45 and ten A and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.
Mass. Gen. Laws ch. 93A, § 1(b) (emphasis added). The Court finds that BCBS Massachusetts has demonstrated that it is not engaged in "trade or commerce" for the purposes of barring it from bringing a Section 9 claim, as it is a charitable institution not engaged in trade or commerce when it undertakes activities in furtherance of its core mission. The Massachusetts Supreme Court has found that "[a]n entity's status as a `charitable' corporation is not, in and of itself, dispositive of the issue whether [ch.] 93A applies." Linkage Corp. v. Trs. of Boston Univ., 425 Mass. 1, 679 N.E.2d 191, 207 (1997) (cert. denied 522 U.S. 1015, 118 S.Ct. 599, 139 L.Ed.2d 488 (1997)) (internal quotation marks omitted). Such an inquiry is fact intensive. See id. at 209.
Linkage Corp. sets forth two particularly relevant criteria bearing on the "trade or commerce" question. First, "[i]n most circumstances, a charitable institution will not be engaged in trade or commerce when it undertakes activities in furtherance of its core mission." Id. This is so because "a nonprofit or charitable corporation [such as BCBS Massachusetts] is not engaged in trade or commerce `if, in the transaction in question, the nonprofit is merely engaged in the customary business necessary to meet its charitable purpose.'" Trs. of Boston Univ. v. ASM Communications, Inc., 33 F.Supp.2d 66, 77 (D.Mass. 1998) (citing Massachusetts Sch. of Law at Andover, Inc. v. American Bar Ass'n, 952 F.Supp. 884, 890 n. 4 (D.Mass.1997) (summarizing recent Massachusetts case law)); see also All Seasons Servs., Inc. v. Comm'r of Health & Iosps., 416 Mass. 269, 620 N.E.2d 778, 780 (1993) (nonprofit hospital's solicitation of bids for a contract to provide food services was incidental to its core mission of providing medical services and thus not "trade or commerce" under ch. 93A).
BCBS Massachusetts's charitable mission is set forth in its enabling statute, Mass. Gen Laws ch. 176B ("ch. 176B"). Further, BCBS Massachusetts has alleged that it is a medical service corporation under ch. 176B, and operates as a "non-profit medical service plan" pursuant to which it provides "health services," including prescription drug benefits, to its members. See Complaint* ¶ 14; see also generally ch. 176B. BCBS Massachusetts's core mission has been recognized by the First Circuit as well:
Blue Shield of Massachusetts, Inc. and Blue Cross of Massachusetts, Inc. are nonprofit, tax exempt medical service and hospital service corporations, organized to provide "for the preservation of the public health by furnishing medical services at low cost to members of the public who become subscribers...." 1941 Mass. Acts c. 306, preamble. Mass.G.L. c. 176B (Blue Shield); c. 176A (Blue Cross).
Kartell v. Blue Shield of Massachusetts, Inc., 592 F.2d 1191, 1191 (1st Cir.1979). The transactions identified by Plaintiff herepayment for members' prescription drug claims, see, e.g., Complaint* ¶¶ 1-8  are clearly at the core of BCBS Massachusetts's charitable mission. Further, while the Court has not found cause to review any of Plaintiff's financial statements, the Court must construe the complaint in the light most favorable to the Plaintiff and accepts as true for purposes of the instant motion BCBS Massachusetts's allegation that it does not "profit" under the specific transactions at issue (i.e., payment for its *46 members' prescription drug claims). See Square D. Co., 476 U.S. at 411, 106 S.Ct. 1922; In re United Mine Workers, 854 F.Supp. at 915.
Second, as Linkage Corp. also held that an absence of legislative mandate tended to indicate the presence of Section 11 "trade or commerce," see Linkage Corp., 679 N.E.2d at 208, it is logical that the presence of legislative mandate necessarily tends to demonstrate the absence of "trade or commerce." BCBS Massachusetts is a creation of statutory law that subject to both legislative mandate and constraint. For example, pursuant to Mass. Gen Laws ch. 176, § 23 and ch. 176B, § 13, the state commissioner of the Division of Insurance is responsible for ascertaining, inter alia, that BCBS Massachusetts is "not being operated for profit" and is maintaining sufficient reserves. The commissioner may apply at any time for an injunction enjoining BCBS Massachusetts's further transaction of business if she finds that it is being operated for profit, and the Massachusetts Attorney General or any district attorney can also enforce those requirements. Ch. 176B, § 17 (2001). Other statutory provisions require various reporting requirements and financial constraints. See generally Mass. Gen Laws chs. 176A and 176B. Such close legislative oversight distinguishes BCBS Massachusetts from profit-driven entities engaged in "trade or commerce." See Poznik v. Massachusetts Med. Prof'l Ins. Ass'n, 417 Mass. 48, 628 N.E.2d 1, 2-3 (1994); Barrett v. Massachusetts Ins. Insolvency Fund, 412 Mass. 774, 592 N.E.2d 1317, 1319 (1992).
A recent opinion from another district court dealt with an similar argument regarding Sections 9 and 11 of ch. 93A, and found that Plaintiff BCBS Massachusetts "has standing to assert a claim under Section 9 of Massachusetts's Consumer Protection Act." In re Cardizem CD Antitrust Litig., No. 99-md-1278, slip op. at 6 (E.D. Mich. May 27, 2003). As in the case at bar,
BCBS Massachusetts has pled facts showing that it is a nonprofit corporation created by statute and regulated by the Commonwealth of Massachusetts, and that the activity in questionits customary payment or reimbursement for its members' prescription drug benefitsfalls within its charitable mission as set forth by statute and case law.
Id. at 7-8. Plaintiff BCBS Massachusetts has made virtually identical allegations of its nonprofit status in this case. Complaint* ¶¶ 14, 115, 143, 171, 201, 231, 257, 285, 311.
There are several Massachusetts cases which have described situations in which a non-profit entity might be deemed to be acting within "trade or commerce." All of those situations, however, are distinguishable on the facts from the case before the Court. One such case is Linkage Corp. (discussed supra). However, the factual scenario in that case was far different from the case at hand. The Linkage court specifically noted that the defendant in that case "did not operate under any legislative constraints." Id. at 208. Further, unlike the activities in which BCBS Massachusetts engaged in the case at hand, the contractual relationship at dispute in Linkage "did not involve anything that could be said to be purely incidental to the university's [core] mission ...." Id.
Miller v. Risk Mgmt. Found. of Harvard Med. Insts., Inc., 36 Mass.App.Ct. 411, 632 N.E.2d 841 (1994) is also distinguishable. In Miller, the Massachusetts Appeals Court found "[t]hat the [Defendant] is nominally a charitable organization, working support of veritable charitable institutions, does not allow it to escape from ch. 93A where, as here, it has in fact *47 performed in a business way." Yet the Miller court went on to distinguish the holdings of Poznik and Barrett. Unlike the factual scenario presented in Miller, the facts in Poznik and Barrett led those courts to note the relevance of determining that a party is a legislatively created and controlled entity which engaged in transactions that were motivated by legislative mandate, not business or personal reasons. Indeed, "[a] nonprofit or charitable corporation [as this Court has determined BCBS Massachusetts to be] is not engaged in trade or commerce `if, in the transaction in question, the nonprofit is merely engaged in the customary business necessary to meet its charitable purpose.'" Trs. of Boston Univ., 33 F.Supp.2d at 77 (internal citations omitted) (emphasis added).
Bolden v. Liquor Liab. Joint Underwriting Ass'n of Massachusetts, No. 980999B, 2000 WL 1473569 (Mass.Super. June 29, 2000) is equally distinguishable. After noting that "whether a party is acting in `trade or commerce' under [ch. 93A] depends on the facts of each case," the Bolden court found that the defendant's profit retention structure indicated that the defendant operated with business motives despite its "non-profit" label. Id. at * 6-7. As discussed supra, this Court has made a contrary determination regarding BCBS Massachusetts.
Finally, Massachusetts Farm Bureau Fed'n v. Blue Cross of Massachusetts, 403 Mass. 722, 532 N.E.2d 660 (1989) arguably supports the claim that BCBS Massachusetts is recognized as engaging in trade and commerce for purposes of ch. 93A. In that case, the Massachusetts Supreme Court found no error in the lower court allowing Plaintiff to proceed against BCBS Massachusetts under Section 11. However, that opinion is devoid of discussion as to the propriety of a plaintiff pursuing a claim against BCBS Massachusetts under Section 11 versus Section 9. Mass. Farm Bureau is completely silent as to this issue, and merely discusses whether the trial judge erred in finding that the Defendants committed deceptive acts. This Court finds that more recent Massachusetts Supreme Court case law supports the position that BCBS may pursue a claim under Section 9. See, e.g., Linkage, Poznik, and Barrett, all discussed supra.
As the Court has found that Plaintiff's claim may validly proceed under Section 9 of the Consumer Protection Act, the Court need not further address the issues surrounding Section 11, since "a ch. 93 Plaintiff must proceed under either Section 9 or Section 11, but not both." John Beaudette, Inc., 94 F.Supp.2d at 120-24.

C. HCSC Has Not Failed to State a Claim Under the Illinois Antitrust Act for Sales that Occurred in Texas and New Mexico.

1. Defendants' Arguments
In Counts 1 through VIII of its Complaint, HCSC is seeking to recover under the Illinois Antitrust Act for damages allegedly suffered by its divisions, [to include BCBS Texas and BCBS New Mexico] in three "relevant states" [Texas, New Mexico, and Illinois]. See Complaint ¶¶ 79, 91, 99, 112, 124, 136, 149, and 161. The issue before the Court is whether HCSC has failed to state a claim under the Illinois Antitrust Act for sales that occurred in Texas and New Mexico. Generally, an Illinois statute has no extraterritorial force and is applicable only to persons and things within Illinois. See Glass v. Kemper, 920 F.Supp. 928, 931-32 (N.D.Ill. 1996) (same).[8] "Applying an Illinois statute *48 to sales that take place wholly outside the state, whether or not the commerce has an effect within the state, would violate the Commerce Clause." Healy v. Beer Institute, 491 U.S. 324, 336, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); see also In re Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 613 (7th Cir. 1997) (holding that "[a] state [antitrust act] cannot regulate sales that take place wholly outside it.").

2. Analysis
It is true that "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature." Healy, 491 U.S. at 336, 109 S.Ct. 2491. However, the Illinois Antitrust Act was amended in 1969 to include section 10/7.9, which provides, "[n]o action under this Act shall be barred on the grounds that the activities or conduct complained of in any way affects or involves interstate or foreign commerce." 740 Ill. Comp. Stat. 10/7.9. Therefore, by its plain terms, the Illinois Antitrust Act is not limited to the geographical boundaries of the state of Illinois, but governs conduct wholly within the state and, in addition, certain interstate activity.
It is a determination of the nexus between the alleged antitrust violation and the state of Illinois which defines the reach of the Illinois Antitrust Act. This Court finds relevant guidance from a case involving alleged antitrust violations in the industrial waste disposal market in a geographic market involving those portions of Illinois, Indiana, Wisconsin, and Michigan within 150 miles of Cook County, Illinois. See Mr. Frank, Inc., v. Waste Mgmt., Inc., 591 F.Supp. 859, 862 (N.D.Ill.1984). Similar to the case at hand, the plaintiff in Mr. Frank brought a claim under the Illinois Antitrust Act, and the defendant moved to dismiss "because the actions which [plaintiff] alleges do not affect Illinois commerce substantially." Id. at 869. The plaintiff had alleged that the antitrust violations resulted in higher prices for disposal and treatment in the "relevant geographic market [which] include[d] much of Illinois." Id. In this light, the court held that "[p]rice increases in a market which encompasses part of Illinois are a sufficiently substantial effect on Illinois commerce for [plaintiff] to seek relief under the Illinois Antitrust Act." Id.; see also Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (finding that "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States") (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 582 n. 6, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).
This Court therefore holds that the Illinois Antitrust Act extends not only to illegal antitrust activity that occurs wholly within Illinois, but also to activity which may have effects in that state and which may have occurred, in part, outside of Illinois. See generally In re Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599 (7th Cir.1997) (finding plaintiffs, who alleged a price-fixing scheme by prescription drug manufacturers, made legitimate state antitrust law claims for relief despite precedent suggesting otherwise and although it was doubtful than any of the alleged price-fixed sales occurred intrastate); Emergency One, Inc. v. Waterous Co., Inc., 23 F.Supp.2d 959, 966 (E.D.Wis.1998) ("the Wisconsin Supreme Court has for some time interpreted the state antitrust statutes to reach interstate *49 activities in certain circumstances and has rejected a mutually exclusive vision of state/federal antitrust enforcement.... [T]o dismiss state antitrust claims with any interstate aspect is therefore misplaced and inconsistent with Wisconsin precedent.").
A state regulation is pre-empted by the "negative" or "dormant" Commerce Clause only if the state regulation unduly impedes upon interstate commerce such that it is in direct conflict with federal law. Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Oregon, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) ("[N]ondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless `the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'") (citation omitted); Kassel v. Consol. Freightways Corp. of Delaware, 450 U.S. 662, 669-70, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) ("The Commerce Clause does not, of course, invalidate all state restrictions on commerce. It has long been recognized that, `in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.'"); Pike v. Bruce Church, Inc., 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) ("Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.").
In the case at hand, the scope of the Illinois Antitrust Act does not directly conflict with that of the Sherman Act such that the state statute is partially pre-empted. The Illinois legislature stated that "[t]he purpose of this Act is to promote the unhampered growth of commerce and industry throughout the State [of Illinois] by prohibiting restraints of trade which are secured through monopolistic ... practices and which act or tend to decrease competition ...." 740 Ill. Comp. Stat. § 10/2. This is a legitimate state purpose. ARC America, 490 U.S. at 102, 109 S.Ct. 1661 ("State laws to this effect are consistent with the broad purposes of the federal antitrust laws: deterring anticompetitive conduct and ensuring the compensation of victims of that conduct."). Indeed, if a state's antitrust statute "is limited today as it once was to commerce that is not within the regulatory power of Congress under the commerce clause, it is a dead letter because there are virtually no sales, in [Illinois,] Alabama or anywhere else in the United States, that are intrastate in that sense." In re Brand Name, 123 F.3d at 613 (emphasis in original) (citations omitted). "Ordinarily, state causes of action are not pre-empted solely because they impose liability over and above that authorized by federal law," ARC America, 490 U.S. at 105, 109 S.Ct. 1661 (citations omitted), and "no clear purpose of Congress indicates that [this Court] should decide otherwise in this case." Id.
In reaching its holding that HCSC has stated a valid claim under the Illinois Antitrust Act for sales that occurred in Texas and New Mexico, the Court notes that HCSC is not barred from recovery under the Illinois Antitrust Act due to the argument that its sales allegedly occurred "wholly outside" of Illinois. The Complaint clearly states that HCSC "is an Illinois Mutual Legal Reserve Company *50 incorporated under the laws of Illinois .... [and] is a citizen of the state of Illinois .... [and] is licensed to do and is doing, business principally in the states of Illinois, Texas, and New Mexico." Complaint ¶ 14. Crucially, HCSC  a citizen of Illinois entitled to protection under Illinois lawsclaims that it is the party ultimately financially responsible for paying the prescription drug costs for all of its subscribers in Illinois, Texas, and New Mexico, not just those in Illinois. See Complaint ¶ 14. HCSC has clearly alleged that it was injured by being required to pay millions of dollars in illegal overcharges to Defendants for drugs, and that those injuries occurred at least in part in Illinois and had a substantial effect in Illinois. See Complaint ¶ 14, 71-74. At this point in the litigationa motion to dismissthe Court must construe HCSC's Complaint in the light most favorable to Plaintiff and must accept as true all allegations and all reasonable factual inferences drawn from well-pleaded factual allegations. See Square D. Co., 476 U.S. at 411, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986); In re United Mine Workers, 854 F.Supp. at 915 (D.D.C. 1994). Therefore, since HCSC has averred that its corporate offices and headquarters in Illinois were ultimately financially responsible for overpayments that allegedly occurred in Texas, New Mexico, and Illinois, the Court will accept that as true at this time. If, at a later stage in this litigation, Defendants are able to demonstrate that this is not the case, the Court will revisit this issue.
Accordingly, the Court finds that HCSC has stated a valid claim under the Illinois Antitrust Act for sales that occurred in Texas and New Mexico.[9]

D. Plaintiffs Have Alleged a Valid Claim for Unjust Enrichment
In Count XVII of the Complaint filed by BCBS Minnesota, Federated, and BCBS Massachusetts, and in Count IX of HCSC's Complaint, Plaintiffs allege that Defendants have been unjustly enriched through payments made by Plaintiffs to their subscribers for Lorazepam and Clorazepate tablets, which Plaintiffs contend conferred an economic benefit upon Defendants in the nature of wind-fall profits. See Complaint* ¶¶ 337-345; Complaint 174-183.[10]
To state a general claim for unjust enrichment, Plaintiffs must establish that: (1) they conferred a legally cognizable benefit upon Defendants; (2) Defendants possessed an appreciation or knowledge of the benefit; and (3) Defendants accepted or retained the benefit under inequitable circumstances. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen, & Helpers of Am. v. Ass'n of Flight Attendants, AFL-CIO, 864 F.2d 173, 177 (D.C.Cir.1988). "The doctrine of unjust enrichment has at all times been fundamentally equitable in nature, notwithstanding its long association with the law of contracts." BCCI Holdings (Luxembourg) Societe Anonyme v. Khalil, 56 F.Supp.2d 14, 64 (D.D.C., 1999) (Hens Green, J.) (citations omitted). "To qualify for an award of restitution under this theory, [Plaintiffs] must show that [they] conferred a benefit (usually money) on [Defendants] under circumstances in which it would be unjust or inequitable for [Defendants] to retain the *51 benefit." Id. at 64-65 (citations omitted). Because of the doctrine's equitable nature:
[E]very unjust enrichment case is factually unique, for whether there has been unjust enrichment must be determined by the nature of the dealings between the recipient of the benefit and the party seeking restitution, and those dealings will necessarily vary from one case to the next.
Id. at 65. "A necessary element of a claim of unjust enrichment is that the plaintiff conferred a benefit on the defendant." Seafarers Welfare Plan v. Philip Morris, 27 F.Supp.2d 623, 635-36 (D.Md.1998); see also Oregon Laborers, 185 F.3d at 968. However, if the Plaintiffs paid health care benefits to their insureds merely pursuant to a contractual relationship or other legal obligation, a benefit could not have been conferred on Defendants. Seafarers, 27 F.Supp.2d at 635. Accordingly, the Court must look to the unique facts of this case to determine if unjust enrichment is available to the Plaintiffs. BCCI Holdings, 56 F.Supp.2d at 65.
Seafarers initially appears to mandate dismissal Plaintiffs' unjust enrichment claims since the Plaintiffs provided third party reimbursement pursuant to insurance coverage offered to and contracts with unnamed employee benefit plans that provide prescription drug coverage to their members. See Complaint* ¶ 39; Complaint ¶ 14. However, Plaintiffs are not asserting unjust enrichment claims on the basis that they paid health care benefits to their insureds. On the contrary, Plaintiffs have asserted an action on their own behalf and on behalf of their self-funded customers. See Complaint* ¶ 1; Complaint ¶ 1. As previously noted, "[b]ecause their members' "copayments were the same without regard to the drugs' cost following Mylan's price increase" (e.g., $5 copayment for generic without regard to the price of the generic), Plaintiffs and not their members were forced to eat these price hikes." Complaint* ¶ 96; see also Complaint ¶ 56. This factual scenario is different from that which was before the Seafarers court:
[U]nlike the various suits now pending brought by state attorneys general or other governmental entities, the [plaintiffs] are not the entities which actually paid the increased medical costs from their own assets. Rather, ... "plaintiffs are merely handling the payments with money provided by others, and have no genuine stake in the matter."
Seafarers, 27 F.Supp.2d at 627 (quoting Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, No. 97-5344, 1998 WL 212846 at *2 (E.D.Pa. Apr.22, 1998)).
Further, the benefit Plaintiffs claim that Defendants received is easily cognizable. Plaintiffs BCBS Minnesota, BCBS Massachusetts, and Federated have pled that they absorbed millions of dollars in overcharges, which significantly increased Mylan's revenue and net earnings. See Complaint* ¶¶ 86-88. HCSC has pled similarly. See, e.g., Complaint ¶¶ 50-56; 72-74; see also State Farm Gen. Ins. Co. v. Stewart, 288 Ill.App.3d 678, 224 Ill.Dec. 310, 681 N.E.2d 625, 633 (1997) ("A plaintiff alleging an unjust enrichment may be seeking to recover a benefit which he gave directly to the Defendant, or one which was transferred to the Defendant by a third party." (citation omitted)).
Overall, all four Plaintiffs have adequately pled that they conferred a benefit of money on Defendants "under circumstances in which it would be unjust or inequitable for [Defendants] to retain the benefit." BCCI Holdings, 56 F.Supp.2d at 64.

*52 IV. CONCLUSION
For the reasons stated above, the Court denies Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) [Civ. No. 01-2646 docket # 26].
NOTES
[1] Plaintiffs Blue Cross Blue Shield ("BCBS") Minnesota, Federated Mutual Insurance Company ("Federated"), and BCBS Massachusetts (collectively, "BCBS Plaintiffs") have filed an Opposition ("BCBS Opp'n"). Plaintiffs Health Care Service Corporation, et al. have filed a separate Opposition ("HCSC Opp'n").
[2] All of the Plaintiffs mentioned in the instant motion originally filed one joint complaint, but later filed two separate Second Amended Complaints under the same civil action number [01-2646]. Subsequently, the Court directed on June 25, 2002 that Plaintiffs BCBS Minnesota, Federated, and BCBS Massachusetts be severed from civil action number 01-2646 and be assigned a new case number [02-1299].

For convenience, citations herein to the Second Amended Complaint of Plaintiffs BCBS Minnesota, Federated, and BCBS Massachusetts are accompanied by a "*." References to the Second Amended Complaint of Health Care Service Corporation ("HCSC") will not be noted with a "*."
[3] Defendants also claim that HCSC has failed to state a claim under the Illinois Antitrust Act for Sales that occurred in Texas and New Mexico. This argument is discussed infra at 48-50.
[4] Defendants make the same argument regarding Blue Shield of Virginia v. McCready, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), which is cited at several points throughout this opinion.
[5] Based on the allegations in the Plaintiffs' complaints in this case, the Court finds that separate discussions of the first two AGC factors would overlap. Accordingly, the Court will discuss these two factors together.
[6] The Defendants do not dispute that BCBS Massachusetts constitutes a "person" under this definition.
[7] Both pertinent parties agree on this point. See Def. Mot. at 24; BCBS Opp'n at 29.
[8] Glass involved an alleged violation of the Illinois Wage Payment and Collection Act.
[9] As the Court has found that HCSC may proceed under the Illinois Antitrust Act, the Court need not address the issues regarding the applicability of Texas and New Mexico laws.
[10] The Court has pendent jurisdiction to consider this claim. United Mine Workers v. Gibbs, 383 U.S. 715, 725-26, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).